NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

ANGEL T., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, D.K., E.D., E.M., *Appellees*.

No. 1 CA-JV 21-0025
FILED 9-9-2021

---

Appeal from the Superior Court in Apache County
No. S0100JD201900010
The Honorable C. Allen Perkins, Judge *Pro Tempore*

**AFFIRMED**

---

COUNSEL

E.M. Hale Law, Lakeside
By Elizabeth M. Hale
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Lauren J. Lowe
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge Cynthia J. Bailey and Judge Jennifer M. Perkins joined.

---

**C R U Z**, Judge:

¶1        Angel T. ("Mother") appeals the superior court's order terminating her parental relationship to her children D.K., E.D., and E.M. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

¶2        Mother is the biological parent to D.K., born November 2012; E.D., born December 2016; and E.M., born September 2018.  Mother has a long history of substance abuse, and the Department of Child Safety ("DCS") has received multiple reports of the family, including D.K. being unsupervised, Mother often appearing intoxicated, and domestic violence between Mother and Joey D. ("Father").[1]  DCS also received a report that E.M. was born substance exposed.

¶3        In January 2019, Mother overdosed and required psychiatric treatment and hospitalization.  Around this time, Father was in and out of prison for drug-related charges.  Mother left the children in her cousin's care for about six months before they were returned to her.  However, a month later, Mother was arrested for possession of drug paraphernalia. Mother initially placed the children with maternal grandmother, but Mother's cousin soon took custody of the children again because maternal grandmother was unable to provide the proper care for them.  Although Mother was released from jail after about a week, she did not attempt to contact her children.

¶4        DCS filed a dependency petition in August 2019, alleging the children were dependent as to Mother due to substance abuse and neglect. The children remained with Mother's cousin.  DCS offered Mother the following services: individual counseling, family counseling, substance

---

[1]        Father is the biological parent of E.D. and E.M.  Father is not a party to this appeal.  The whereabouts of the biological father of D.K. are unknown.

abuse assessment, substance abuse treatment, drug testing, domestic violence services, parenting skills training, and transportation assistance. Mother was already receiving outpatient and counseling services through Little Colorado Behavioral Health ("LCBH") since her hospitalization in January 2019.

¶5 Mother completed phone visits with the children up to three times a week. Supervised visitations were initially scheduled for once a week for four hours. However, at Mother's request, visitations were reduced to once a month. Mother was inconsistent with attending and scheduling her visitations, and so the referral for supervised visits was closed out due to lack of contact. Mother unsuccessfully closed out of parent skills services and parent aide services due to her lack of contact and refusal to participate.

¶6 Mother's drug testing services were initiated in August 2019, but they were soon suspended because Mother failed to call the drug testing center. Mother attended a thirty-day inpatient drug treatment program in December 2019; however, by February 2, 2020, Mother was using methamphetamine. DCS reported that Mother was difficult to get in contact with, her housing was inconsistent, and she was unemployed.

¶7 In August 2020, DCS moved to terminate Mother's parental rights based on chronic substance abuse. Mother's participation in services slightly improved, and she began to regularly participate in online parenting classes. She also completed two supervised visits. DCS reinitiated drug testing in September 2020, but Mother once again was suspended for failing to call in. DCS again reinitiated the drug testing in November 2020, and it wasn't until a couple weeks before the termination hearing that Mother started to regularly call in. She submitted one drug test by the time of the hearing, which was negative. Mother also reported that she began renting her own residence in September 2020, and she started a job in mid-October 2020.

¶8 A two-day termination adjudication hearing was held, and the superior court found Mother's "efforts to simply be too little, too late," and it terminated on the ground of chronic substance abuse. Mother timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

¶9 Although the right to custody of one's children is fundamental, it is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196

Ariz. 246, 248, ¶¶ 11-12 (2000). The superior court may terminate a parent-child relationship if it finds clear and convincing evidence of at least one statutory ground for termination under A.R.S. § 8-533(B), and that termination is in the child's best interests. *Id.* "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). This court does not reweigh the evidence and will look only to determine if there is reasonable evidence to sustain the court's ruling. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

I.      Statutory Ground

**¶10**        Mother's parental rights were terminated on the ground of substance abuse. Under A.R.S. § 8-533(B)(3), the superior court must find that Mother's drug abuse is chronic, it hinders her ability to discharge her parental responsibilities, and it will continue for a prolonged indeterminate period. Mother argues the court abused its discretion by finding that her substance use impaired her ability to parent or that her drug use would continue indeterminately.

        A.      History of Chronic Drug Abuse

**¶11**        Mother has a long history of drug abuse that began when she started smoking marijuana at five years old. Mother began using methamphetamine at age thirteen and reported that she used heavily through the age of twenty-one, at which point she gave birth to a child born exposed to methamphetamine.[2] Mother also began drinking alcohol around age seven or eight, and reported abusing alcohol beginning at the age of twenty-one.

**¶12**        Mother claims there is no evidence she has "used drugs in the recent past," but the record shows Mother consistently struggled to maintain sobriety in the years before the termination motion. In 2018, Mother tested positive for marijuana during her prenatal visits while pregnant with E.M., and E.M. tested positive for methamphetamine and marijuana at birth. In January 2019, Mother was hospitalized for an overdose, and she admitted to using methamphetamines in May 2019. In July 2019, Mother was arrested for possession of drug paraphernalia and

---

[2]     This child is not a part of this appeal and was removed from Mother's care during a prior dependency in 2009.

marijuana, and she again admitted to using methamphetamines in September 2019. Mother also conceded she used methamphetamines as recently as February 2020, and DCS received reports in July 2020 that Mother was seen in the community under the influence of substances.

¶13 During the dependency, Mother failed to prove her sobriety through drug testing. DCS initiated drug testing services in August 2019, but Mother's account was suspended because she failed to participate. Although drug testing was unavailable for several months due to the pandemic, Mother failed to take advantage of drug testing services when they were available. DCS then submitted a request for drug testing services in September 2020, and Mother was again suspended for failing to participate. Ultimately, Mother submitted her first drug test less than two weeks before the termination adjudication hearing. While Mother's drug test was negative, she failed to provide any drug tests from August 2019 to April 2020 and September 2020 to November 2020.

### B. Parenting Responsibilities

¶14 The evidence supports the court's finding that Mother's chronic substance abuse prevented her from exercising her parental responsibilities. When D.K. was five years old, police found him wandering outside during a rainy night while Mother appeared to be intoxicated. There were other similar reports to DCS of D.K. being unsupervised and letting himself into his neighbor's home while Mother's whereabouts were unknown. When Mother was arrested, she initially left the children in the care of maternal grandmother, who was living in a trailer with no running water or electricity and did not have the financial means to care for the children. Additionally, the children had been living with Mother's cousin for six months prior to DCS' involvement, and Mother did not visit the children or provide any support during that time.

¶15 While Mother argues that she can appropriately parent now that she has obtained employment and housing, for most of the dependency Mother's housing was inconsistent, and Mother had only been working for several weeks at the time of the termination hearing. DCS also testified that the condition of Mother's current housing was not suitable for children, and there was testimony that Mother had recently resided with a person who was knowingly hiding someone charged with attempted murder. There is reasonable evidence that Mother is currently unable to make appropriate decisions and discharge her parenting responsibilities.

### C.    Prolonged Indeterminate Period

**¶16**    There is also reasonable evidence that Mother's drug use will continue for a prolonged indeterminate period.  In determining whether a parent would be able to overcome her substance abuse and "be in a position to parent the child in the foreseeable future," the court considers "the treatment history of the parent."  *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 378, ¶ 25 (App. 2010) (citation omitted).  When the parent has been unable to "experience sustained sobriety in a noncustodial setting, and establish the essential support system to maintain sobriety, there is little hope of success in parenting."  *Id.* (citation omitted).  Mother has completed multiple treatment programs over the years, but she has failed to stay clean.  Most recently in December 2019, Mother completed a thirty-day inpatient program, but she admitted to using methamphetamine about a month after completing the program.  Mother "has been unable to rise above [her] addiction in a non-custodial and unstructured setting," and "[t]he interests in permanency for [the children] must prevail over [Mother's] uncertain battle with drugs."  *Id.* at 379, ¶ 29 (internal quotation marks and citation omitted).

**¶17**    Given Mother's long history of struggling with substance abuse, and her failure to fully participate in services to address these problems, the superior court did not err in finding that Mother's chronic drug abuse negatively affects her parenting abilities and that it will persist for a prolonged indeterminate period.

## II.    Reasonable Efforts

**¶18**    Prior to terminating parental rights, DCS must prove by clear and convincing evidence that it made a reasonable effort to preserve the family and provide reunification services.  *Mary Ellen C. v. Dep't of Econ. Sec.*, 193 Ariz. 185, 192-93, ¶¶ 33, 42 (App. 1999).  While DCS is not obligated "to undertake rehabilitative measures that are futile," it must "undertake measures with a reasonable prospect of success."  *Id.* at 192, ¶ 34.

### A.    Americans With Disabilities Act

**¶19**    Mother argues that DCS did not make reasonable efforts to provide reunification services that comply with the Americans with Disabilities Act ("ADA").  *See* 42 U.S.C. § 12101-12213.  "The ADA imposes an affirmative duty on public entities to make 'reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter the nature of the service' provided."  *Jessica P.*

*v. Dep't of Child Safety*, 251 Ariz. 34, 38, ¶ 13 (App. 2021) (quoting 28 C.F.R. § 35.130(b)(7)(i)).  Mother failed to raise her ADA argument below, so we will reverse the termination ruling only if she can show that fundamental error occurred.  *See id.* at 39, ¶ 16.  Under fundamental error review, Mother must prove that (1) error exists, (2) the error is fundamental, and (3) the error caused her prejudice.  *Id.*

**¶20**         Mother claims "DCS did not provide a single service designed to address" Mother's mental illness.  However, Mother's LCBH records indicate that she completed a psychiatric diagnostic evaluation, and she continued mental health services with LCBH throughout the dependency.  While Mother argues these services were not addressed to assist her with the dependency case, the initial psychiatric evaluator noted Mother "reports that it is her goal to obtain treatment so as to meet the requirement of DCS and assure improved stability in her life."  In subsequent progress notes, Mother reported to her physician what was happening with her dependency case, and she discussed her children, indicating that these behavioral health services related to the dependency proceedings.  And in any event, the services were geared towards Mother managing her medication, coping with and responding to mental health crises, and becoming more stable in life, all key aspects of reunification.

**¶21**         Further, multiple court orders indicate that DCS offered Mother a behavioral health assessment and/or treatment.  A team meeting report from December 2019 noted that Mother was offered individual counseling and family counseling.  Additionally, while Mother contends DCS did not provide services designed to teach her to parent in light of her mental health problems, Mother was offered services specific to parenting, which included parent aide services and parenting skills services.  These services were closed out due to Mother's lack of participation.  DCS is not required "to provide every conceivable service or to ensure that a parent participates in each service it offers," and "[M]other's failure or refusal to participate in the programs and services [DCS] offered or recommended does not foreclose termination of her parental rights."  *Maricopa Cnty. Juv. Action No. JS–501904*, 180 Ariz. 348, 353 (App. 1994).

**¶22**         The record demonstrates that DCS offered appropriate services that complied with the ADA.  Mother has failed to demonstrate that fundamental error occurred.

**B.      Substance Abuse Services**

**¶23**      Mother argues DCS also failed to make reasonable efforts by failing to provide her with sufficient time to demonstrate sobriety.  Mother contends that because drug testing services were unavailable for several months due to the pandemic, she should have been given additional time before DCS moved for termination.

**¶24**      A DCS specialist testified that it would want to see about four to six months of sobriety from a parent prior to reunification.  Here, Mother had the opportunity to participate in drug testing from August 2019 to April 2020, and again from September 2020 to November 2020.  This would have been more than enough time for Mother to prove her sobriety under DCS' standards.  Additionally, Mother could have taken advantage of other services while the drug testing was unavailable, like substance abuse treatment, to demonstrate to DCS she was sober.  However, she failed to do so.

**¶25**      Mother also alleges DCS failed to assist her with getting a telephone, and she claims that her failure to participate in drug testing was due to her inability to call into the drug testing center.  There is no evidence that Mother ever asked DCS to assist her in getting a phone.  Additionally, Mother was participating in phone visits with her children, and she was using her cell phone to take parenting classes.  Presumably, Mother also had sufficient telephone access to participate in drug testing.  Mother also was observed with a phone during two in-person visits with her children.

**¶26**      DCS must provide "[M]other with the time and opportunity to participate in programs designed to help her become an effective parent."  *JS–501904*, 180 Ariz. at 353.  Here, DCS provided Mother with sufficient time and opportunities to demonstrate sobriety, and her "children should not be forced to wait for their parent to grow up." *Raymond F.*, 224 Ariz. at 378, ¶ 25 (citation omitted).  We find no error.

III.    Written Findings of Fact

**¶27**      Finally, Mother argues that the court failed to make specific findings of fact as required by A.R.S. § 8-538(A) and Arizona Rule of Procedure for the Juvenile Court ("Rule") 66(F)(2)(a).

**¶28**      Section 8-538(A) states that the court's termination order "shall be in writing and shall recite the findings on which the order is based, including findings pertaining to placement of the child and the court's jurisdiction."  Rule 66 requires that "[a]ll findings and orders shall be in the

form of a signed order or set forth in a signed minute entry," Rule 66(F), and it further requires that the court "[m]ake specific findings of fact in support of the termination of parental rights." Rule 66(F)(2)(a).

**¶29** Mother argues the court's under advisement ruling does not include sufficient facts. However, this ruling was not the final order. The superior court later issued its final order, wherein it adopted DCS' proposed findings of fact and conclusions of law. *See Elliott v. Elliott*, 165 Ariz. 128, 134 (App. 1990) (the court "may adopt proposed findings that the parties submit, but only if those findings are consistent with the ones that it reaches independently after properly considering the facts"). This order satisfies the statutory and rule requirements, and it includes findings related to placement, jurisdiction, and Mother's chronic substance abuse. We find no error.

## CONCLUSION

**¶30** For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:     AA